Welcome to the Fourth Circuit and are we missing one of the lawyers on screen here? There we go. So our first case is Al-Sabah v. World Business Lenders. Mr. Rosenfeld, I understand you had a time trying to get here so we're glad to have you bid in. I did, Your Honors, and I want to thank the court so much for the accommodation. I really appreciate it. Well, it would have been a long walk, so we'll be glad to hear from you. May it please the court, Your Honors, my name is Steve Rosenfeld and I represent the defendant and appellant World Business Lenders. In 2014 and 2015 a man named Gene Agbajabi defrauded the plaintiff out of a substantial amount of money. In January of 2015, he used $360,000 of that money to buy himself a home without the plaintiff's knowledge. This case poses the question of whether WBL, a lender, who more than two years later lent money to a business that was owned by Mr. Agbajabi, with that home serving as collateral for Mr. Agbajabi's personal guarantee, could substantially assist his long-completed fraud. Fraud that the plaintiff had already discovered, fraud that the plaintiff had already filed a federal lawsuit against Mr. Agbajabi alleging that he met all of the elements of the tort of fraud, including damages, and fraud that the plaintiff even filed a lease penance on the home that's in question here based on that lawsuit alleging fraud. All before WBL gave Mr. Agbajabi's company the loan in question, that is loan number three. So as a matter of law and a matter of common sense, frankly, WBL could not have substantially assisted that completed fraud. And we believe that the district court's conclusion, to the contrary, misinterpreted the law and required reversal. Well is that, is it necessary to find for you that we would agree with that characterization? And it seems like that there could be either continuing fraud, if there was such, or separate acts of fraud and so not as a matter of law would that act as a necessary affirmative defense for you? Well, we believe that there are two errors, Your Honor. One is as a matter of law and I believe that when you look at the fraud that the district court seized on, that is the fraud having to do with loan number three, which was the purchase of, the use of the funds to purchase the house. And the district court claimed that we aid and embedded that fraud. And I think that there's been a misinterpretation of that and plaintiff's briefs, I think, to this court furthered that misinterpretation in that they're talking about the entirety of Mr. Agbajabi's actions. That is, the fraud that related to loans one and two and maybe even loan zero, as is referred to in the briefing. But we believe that that is a an expansion of the fraud beyond which is appropriate here because the district court found that we were not willfully blind as to that fraud. And the only fraud that we were willfully blind as to, according to the district court, which is also an issue in our appeal, was the fraud related specifically to loan number three. So, that is the only fraud. Can you explain why you weren't willfully blind to the fraud related to loan number three since the lawsuit and list pendants had already been filed? Sure. So, it's all a matter of timing. What happened here was that Mr. Agbajabi applied for the loan. My client had all of the loan materials. They ran a title search. That title search happened to come up with a lease pendant on the property. One of the individuals, a Ms. Fakiaglu, reached out to Mr. Agbajabi about that lease pendants. He mentioned that it was something having to do with a personal matter. No mention of this matter or of the that the plaintiff made here. My client then reached out to the title company. They eventually ended up issuing another title report without that lease pendants on the property. So, they issued a title that was clean of that. My client received an attorney letter saying that that there are no lawsuits against Mr. Agbajabi. So, with all of that, with the clean title. So, would your view be that, you know, having received the title insurance and the representation letter from counsel from the borrower, that that was sufficient in and of itself to bar a finding of willful blindness? I believe that that's correct, Your Honor, because, mind you, willful blindness is akin, it's a substitute for knowledge. It's not a finding of recklessness. It's not a finding of negligence. If you look at the language in the global tech case, that's the Supreme Court case from 2011, the Supreme Court explains that willful, to find willful blindness, you have to find that the defendant subjectively believes there's a high probability that a fact exists and then the defendant took deliberate actions to avoid learning of that fact. Those are the two elements. And I believe that when you look at what the defendant here did, it reached out to the title company, it reached out to a lawyer. Those two facts alone will preclude a finding of willful blindness. And we believe that the district court erred in still finding willful blindness in that situation and discounting those facts. I think that what the district court did is it turned the willful blindness standard into a recklessness or a negligence standard, which we believe is inappropriate. So, but let's focus again on the substantial assistance piece, because as the court is aware from our briefing, to find aiding and abetting liability, obviously, there has to be proof of the underlying tort, there has to be knowledge or in a substitute willful blindness, and then there has to be substantial assistance in the commission of that wrongful act. Can I ask a question on this line? Sorry, I know it's hard on the video, but no worries. So, so I think a little bit about the distinction here between aiding and abetting, which is what we have, and accessory after the fact. And it seems like that sometimes there's some confusion here, and I wondered if you would talk a little bit about, like, how you see the distinction. I think of aiding and abetting as providing assistance in the commission of the tort, where accessory after the fact is when you're taking actions to help conceal or hide or prevent punishment. And, and I guess I see a pretty reasonable argument to make. I'm not saying I agree with it, but I see a very reasonable argument about your client being an accessory after the fact, but I have a hard time seeing how they provided substantial assistance in the commission of the fraud itself. Can you, can you help me understand these two, two distinctions? Sure. So, I think, I think your Honor has it right, and I think that there is not an accessory after the, first of all, there's no claim for accessory, there's no claim for accessory after the fact here, and I don't even know that that's a concept. No, no, that's a, it's a criminal law concept, I acknowledge, but if this is more of a theoretical distinction that I'm trying to draw, I'm not suggesting that you're criminally responsible under some accessory after the fact statute. I'm just trying to understand the distinction between substantial assistance in the tort and aiding somebody who has already committed the tort, right? And I'm obviously drawing from criminal law principles, but I think the same sense applies here. I would agree, your Honor, and it's interesting that the district court actually mentioned that they viewed my client as the, as the getaway driver, I think was the, was the language that they used. Well, what's interesting about that is, is, is that, that kind of plays into that, that distinction you're trying to make. A getaway driver is there during the, the commission of the crime, and then assists by, by helping the, the perpetrators of the crime leave. And the Supreme Court was clear in the Twitter case that that's exactly what aiding and abetting is. It's helping the, the commission of the actionable tort. In fact, the Supreme Court said in Twitter, it is thus not enough for a defendant to have given substantial assistance to a transcendent enterprise. A defendant must have aided and abetted by knowingly provided substantial assistance, another person in the commission of the actionable wrong. So that's a direct quote from the, from the Twitter case. The Alico case, which is the, the, the Maryland Supreme Court case, uses that same kind of language. It talks about for substantial assistance to encourage, incite, aid, and abet the act of the direct perpetrator of an underlying tort. All of the cases in aiding and abetting talk about assisting that underlying tort. And here, that tort was completed years before my client was involved. So, I- And why, why do you, you, you've said this a couple of times, and I'm not disagreeing with it, but help me understand why you consider the tort here to be the per, the, limited to the purchase of the home that, that's sort of at play here, as opposed to sort of the, the broader sort of scheme of defrauding this woman of, of money in a variety of ways. Because loan number three dealt with the, the issue in loan number three was the, Mr. Agbajabi's business was given $360,000, and for that, my client put a lien on, on this, on this home. And the fraud that we were accused of with respect to loan number three, what the district court talked about with, with respect to loan number three is that we were on a, that, that we helped, we were the getaway driver in allowing the, the Mr. Agbajabi to perfect his fraud with respect to the purchase of that house by putting a lien on that house and not allowing the, the plaintiff to, to be able to get that house back and cure the fraud. So that is, that, that was the focus of the, of the district court. It was not, was there an argument or evidence that the money that you provided in loan three, that that money was somehow otherwise used by Agbajabi as part of the So I understand this argument that, that it sort of provides a wall preventing the recovery.  That doesn't look like a getaway driver to me. That looks like showing up somebody's house after the bank robbery and saying, how about hold on to this money for me? That's an accessory after the fact, it's not a getaway driver. But was there any argument that the money was actually itself used in, in furthering the fraud itself, as opposed to sort of merely sort of what I would say, avoiding recovery or avoiding punishment in an accessory after the fact sense? I don't believe so, your honor. And here's why. I mean, when you look at the, when, when you look at the timeline, all of the, all in July of 2016, and then they filed a lawsuit for fraud against Mr. Agbajabi in March of 2017. So that about, I think the date was March 20th or 27th. And I, and I apologize for not having that exact date. In fact, it was March 20th of 2017. And the loan was given March 30th of 2017. So it was given after they had already filed suit on the fraud. So I don't believe that there's any way that that money could have been used to facilitate that fraud. And your honors, um, I noticed that my, that my time is, is, is now up. Um, you've got some rebuttal time. Yes. And we'll be glad to hear from you further then. Thank you, your honor. All right. Thank you, Mr. Rosenfeld. Mr. McWilliams. Good morning, your honors. Michael McWilliams, Inventable LLP on behalf of Appalachian Cross Appellant, alia al-Sabah. And may it please the court. Excuse me. I'm fighting off a bit of a cold. Judge Richardson, I'd like to respond directly to your question. I'm at a bit of a disadvantage. I, you can put everything I know about criminal law in one of those water bottles and still have room for the water. So I'm not addressing it as a matter of a distinction between aiding and abetting an accessory after the fact so much, but simply sticking to whether it was, whether the, the lender's activities facilitated the fraud. And there's no doubt that they did because up until WBL's arrival on the scene, the money, if you will, was in the ground, the properties had been purchased with that money and improved with that money, and they were there for Ms. al-Sabah to recover. It was only when WBL arrived on the scene and engaged in these loans in which they ignored all of their underwriting guidelines that matter and allow, and in doing so allowed Mr. al-Bujabi to extract the equity from the properties, including the house, which by the way, was purchased for $470,000, not $360,000. These are big numbers, but what they did. He got the money out of it, but try to connect up how, and there's this first mortgage lien, but there's a list pendants filed. So anybody taking that, including the lender, takes it subject to per equitable lien. That that's correct, Your Honor. All right. So what's the, I'm kind of at a loss to find out how you get from there to willful blindness. Well, I think there are two different issues. Getting the money out is the fraud. It's extracting the money, at which point it disappeared. It's gone. And our only resort is. Wait, I'm sorry, so you're, say that again. Say that one more time. I just want to make sure I understood what you just said. Say it one more time. The conversion of the hard real estate asset into liquid cash that Mr. al-Bujabi then squandered was part of the fraud. That's how he capitalized on it. But if she's got an equitable lien under the list pendants, then if the bank is wrong, even though it's got title insurance, it's wrong because it's got an attorney representation letter, then it's taken subject to that. Now they may have to litigate over the priority, but I think to say that it's gone is not correct if she's got a, if she's got an equitable lien that takes priority over the bank. And, and your Honor, that's, I think that's fundamentally correct, but it doesn't mean she doesn't have damage and she's not a victim of that fraud. She's going to. She's got monetary damages. Correct. Right. Seven million. So you had a number of monetary damage claims, went to the jury, got a big verdict, none of that's an issue here. But then you had a separate declaratory judgment action that did not go to the jury and the district court did not give a declaratory judgment. In fact, it entered judgment in favor of the defendant on that. So under Maryland law at that point, the list pendants expired and the district court did not give a constructive trust. None of that had anything to do with the bank. That's correct. But the bank's intervention in facilitating the ability to extract that equity is what completed the damage to Ms. Alcivar. Well, we just may be talking across purposes, but if she, if she had up until that point, an equitable lien that took priority over the bank, I'm at a loss to understand the damages here. Well, first of all, under Maryland law, your Honor, it is damaged to a, to a person has been damaged when they are forced into litigation with a third party, the damages are those litigation costs. And that's what's happened to Ms. Alcivar where she then to contest the lien. Is that the theory on which these damages, I mean, I haven't heard that. I mean, I understand what you're caught in a trap. You got to find some way to get out. But like, that is like in no part of that has been the theory that I've heard of the district court or the plaintiff in the case is that the damage here is, I wasn't really hurt, but I didn't have to go litigate and that my damage was the cost of litigation. So you're, you're correct, Judge Richardson. I was responding to Judge Agee's question. We have not advanced that theory. Our theory is that her damage as a result of the aiding and abetting was when the real property was converted into disposable cash that Mr. Agbajabi then squandered as a, as a result of. And she has a separate judgment for that, that preceded it and in the monetary context, the jury awarded, and it's almost like a double recovery. And that's, I'm just having trouble getting past that because if she has a valid equitable first lien over the bank with, with regard to this house, I'm just not seeing how you get there. It, it's certainly not a double recovery, Your Honor, in the sense that she's getting her damages twice. And just because she has a judgment against a primary tortfeasor does not mean she can't obtain a judgment against the people who facilitated that tort as a separate tort. And those who are liable for aiding and abetting are in a sense liable for the underlying tort damage. So let's go to the aiding and abetting here. Yes. Help me understand the willful blindness. I mean, I've closed a few commercial loans back when I worked for a living. And you had two gold standards. You got a title policy and you got an attorney representation loan. The bank got both of these here. I'm having real difficulty understanding what it was they did wrong. And they, and WBL knew, subjectively knew that both of those representations were fictitious. Mr. Rosenfeld alluded to when the court asked about the Liz Pendens and the complaint. WBL had the caption for the complaint. They ran a Google search on it. Ms. Faccioglu's testimony was not. So they were aware of that. Yes, sir. And they went to a commercial title insurance company and the, and the title insurance company decided we're going to take the risk. We're going to insure this. Why would anybody need to go beyond that? Because as judge Gallagher found your honor, what happened was WBL COO told the title company to simply remove that Liz Pendens. They didn't do an investigation. In fact, what difference does that make? I mean, there'll be dozens of loans closed today in this area, and they're going to be negotiations with the title. It's like nobody in this case ever closed a real estate or commercial loan before. I mean, that just happens every day. It doesn't happen, your honor, in a context in which they remove the Liz Pendens, which is based itself on the existence of the fraud complaint. And your basis in law to make that representation is? It's a basis of fact, your honor. That's. Was there any evidence that anybody from, uh, appellant actually read the complaint or the Liz Pendens? Uh, there, there is evidence that Ms. Fakiaglu had the Liz Pendens filing in her possession. There is not evidence that she specifically read it. There is evidence that WBL ran a Google search and a Pacer search that found the docket for the underlying fraud suit. So that's not knowing the contents of it. No, your honor. But when you have it and you've been told there's a Liz Pendens based on it, when you, when you decline to even obtain a copy of that fraud complaint and explore what it's about, and instead you just take the word of the alleged fraudster, that's willful blindness. That's sticking your head in the sand. What it is that you think they should have done, right? We live in a world where like, we like have some, you know, understanding that other people have expertise, right? And so we're allowed to rely on other people. And so assume that they had read everything. Why? Why isn't it enough? Maybe you want to say it's negligence. Maybe you think that you're an investor, that they're not doing a good job as a steward of their resources. I get that. But how do we get to willful blindness when they go to two different experts and say, listen, in effect, we've got this problem, like, are you good with it? And the two experts say, yes, we're good. I guess I'm just having a real hard time. I mean, I think Judge Thacker's right. I'm not sure you've got the premise here that they knew, but even if they knew, what is it that you would have had them do? Like, did they need to get like a third expert in order to not be willfully blind? So first responding to the expert issue, Your Honor, Judge Gallagher dismissed the bona fides of that attorney opinion letter. It was a form letter from WBL executed the night before. I mean, that's what 90% of the attorney representation letters will be in a closing and the attorney that does the representations, they're taking it upon themselves, they're the ones that are liable in case the representations are incorrect, I mean, that's why you get that. And in this case, I mean, they've made all the representations that you would normally expect after due inquiry, there is no threatened or pending litigation against the borrower that could adversely affect the ability of the borrower. I'm just, I don't mean to keep beating this, but. No, let me respond to it directly. I mean, that's, people do that every day. They don't do it in the face of a representation to which Your Honor just alluded to that WBL knew to be false. The representation was, there are no lawsuits. How did they know it was false? They had the lawsuit. Wait a minute, you've got two professionals, a title company and an attorney that say the opposite. What makes the bank the ultimate metaphysical arbiter of truth or falsity here? I mean, it's just, I'm just having a real difficult understanding how you get at most past negligence. They're, I'm not, I guess I don't understand the concept, Your Honor, that allows them to ignore their own subjective knowledge that the representation which, with which they have been presented is false. They knew it to be false. I just don't understand how you're saying they knew it to be false. Because they had the docket search, Your Honor, that identified a fraud suit naming Ms. Al-Sabah as the plaintiff and Mr. Agbajabi as the defendant. And it identified that suit as a fraud suit. They had that in their file. And when you talk about willful blindness. But that's a suit. It's not a judgment. There's no proven fraud at that point as, as concerns the bank and that particular piece of property. Of course, Your Honor. And there's, I mean, if you went on the basis of allegations in every lawsuit, I think commercial transactions would grind to a halt. I think that's right, Your Honor. But the willful blindness is in elect, subconsciously electing not to pursue that inquiry. It wasn't that they looked at it. No, no. It's to not pursue a third or fourth or fifth expert, right? That's really what you're saying is that like they needed to get a different expert because the two experts in the field weren't good enough. And it's willful blindness to not get a third or fourth. And if it had four, you just say we needed six. Your Honor, our contention is not that they needed another expert to take a look at it. Our contention is that presented by what Your Honor identifies and Judge Gallagher took issue with, an expert opinion that the, um, that there were no lawsuits. They knew that to be false. They didn't need an expert to understand that. What they needed to do was pull down a copy of the complaint and electing not to do that, electing not to call the counsel of record for the plaintiff on that and explore it. That's willful blindness. That's subjectively and consciously choosing to remain ignorant. The opinion didn't just say there were no lawsuits. It said there were no lawsuits that would adversely impact blah, blah, this loan. Well, Your Honor, that's true. And when they pulled down the complaint, they would have seen that among the allegations were the property that secured their loan was procured by fraud. But they, but you don't know if they read it or not. I only have their testimony that they did not. And I would submit to Your Honor that that is the synchronon of willful blindness. Knowing that the answer is there for the simple act of pulling down the complaint and choosing not to do that. And all of this, of course, is in the context of what they knew and had substantial concerns about with regard to Mr. Agbajabi. They repeatedly identified him as a high fraud risk. They knew that the people of whom they asked the questions in the sham investigation they did undertake weren't people who could supply anything other than what Mr. Agbajabi had told them. They asked Mr. Agbajabi, they asked his accountant, and they asked his loan broker. All three of those sources collapsed back into just asking Mr. Agbajabi. Their investigation, such as it was, was a sham. It was a fig leaf. They knew this guy had purchased an apartment. They had the lawyer, the accountant, and the title companies. Now we've got at least three experts. Didn't the accountant show them the gift tax returns that were filed way back then? Yes, Your Honor. And a gift tax return is nothing more than the taxpayer's representation of the same thing he had already told them. To the extent there's expertise. Found under penalties of fraud and perjury. He's an alleged fraudster. I agree with Your Honor. He defrauded her when he took the money that wasn't a gift and he defrauded the United States government when he declared that it was a gift that, by the way, he was found guilty of that fraud. So we know he's a fraudster. They didn't know it at the time, but had they pulled down the complaint, they would have immediately seen the falsity and the representation to them that there were no lawsuits that could affect title to the property. I see, Your Honor, my time is almost up. Anything else you want to tell us in closing? Uh, in closing, I think that there is just. I know. I'm sorry. Go ahead. I apologize. Um, in closing, Your Honor, what we've got here is willful blindness with respect to Loan III that is so far out on the spectrum. It's virtually actual knowledge. It's one complaint pulled down away from actual knowledge. And just to the left of that is the willful blindness that depends on sticking your head in the sand and that's what applied to one. You'll be back. So I'll go to Mr. Rosenfeld. Thank you. Thank you, Your Honor. You're actually, Your Honor, and I will, I'll, I'll keep this brief because I think that the, that the court is focusing on the, on, on the right aspect of a willful blindness, because there was no, as, um, as counsel for the plaintiff, uh, admitted, there was no test of testimony stating that my client WBL actually read or knew the contents of, of, of the, uh, of the lease pendants or the, or the lawsuit. Uh, the only evidence was that it happened to be in their file. And, and I guess the opposing counsel would say that you were, uh, or appellant was willfully blind for not reading, um, what they had in front of them. Well, here's what, well, there's, there's no evidence by the way that it was in front of them and they didn't read it. There was evidence that it was downloaded into the file by, by, by someone. Um, and what the, what the testimony was is that because of the fact that by the time the senior executives made the loan decision, the title company had already insured over it. They already had the attorney letter. He felt no need to go any further. Um, should he have? Maybe. Does he wish he had? Probably, but you know, that, that is, that is more negligence. That is more, should your, you know, should your guideline be better? Should your practices be better? What it is not is willful blindness because willful blindness is taking deliberate action to avoid learning of a fact. Here, they took the deliberate action. They, they, they, they didn't do nothing. They went to the title company. They went to an attorney. Both of them passed over it and then they felt comfortable. They did not go further. So with that, um, I think that the, the, the finding of willful blindness, uh, in this case, um, it's just, it, it was, it was clear error. Um, and for the same reason, we, we have not, um, touched on the, the, the issues of the, of the cross appeal, which I'll try to do in the next couple of minutes. But for the same reason that, um, there wasn't willful blindness with loan three, there clearly wasn't willful blindness with respect to loans one and two. Um, I think, uh, judge, uh, AG mentioned the accountant, um, my client, when it learned of the large wire transfers, not only went and asked, they didn't do nothing, they didn't, you know, affirmatively try to avoid learning about it. They not only went to the borrower, uh, Mr. Agbajabi, but they went to his accountant and the accountant testified that he gave him the gift tax returns, which were filed under penalty of perjury with the government. He also told my client that he met the plaintiff. He's, he testified that he, that he met the princess, believe it or not. And she is a legitimate princess. Um, and that she, and that, and that she, um, made these transfers. So I don't know how, um, with, with that record, with, with asking for documents, with doing, uh, with, with talking with the, with the borrower, with going to one of the borrower's professionals who filed the tax returns and asking him, um, about this, how that is even close to, to do willful blindness. Um, and when you look at there, there, there are two other aspects to the cross appeal. One is there's $150,000 transfer that was made. It was the final transfer. It was made in July of 2016 after the plaintiff admitted that she was, uh, that, that, that she was alerted to, to some potential concerns that, that, that she had told Mr. Agbajabi no more until he gave her documentation. He had not given her documentation. She then gets a call from his wife saying that they're going to lose their, their, their, their home, you know, unless she sends even more money. She, she, you know, she did it anyway. Yeah. So she was the one who was willfully blind. She was the one, well, I don't know if it's that concept, but certainly she couldn't justifiably rely on, on his representations at that point in time. So there was no underlying fraud. So you can't aid in a bet when there's no underlying fraud. Um, with that, I, again, I see my time is up. Um, thank you very much, uh, your honors. Um, I appreciate the opportunity. All right. Thank you, Mr. Roosevelt. Mr. McWilliams, do you want to tell us something about your cross appeal while you, while you can? I do. Um, picking up on the thread of, of the question Judge Thacker, um, asked about the lawsuit that was in front of them. I submit to your honors that this is still on, on line three, but it is important point, electing not to pull down a copy of the complaint is the epitome of willful blindness. You agree they didn't have the complaint in the file. There's been some discussions that there's a little ambiguity here. They had the Liz Pendens in the file, but not the complaint. The Liz Pendens itself had a copy of the complaint, your honor. So I think that point is not entirely clear. It's an open question. It is. So, I mean, maybe I'll rephrase it because it seems like you are trying to, um, in the record, what is the best evidence that the file included in some way or another, the actual complaint, as opposed to a copy of the Liz Pendens without the complaint, because I thought the record showed there was a copy of the Liz Pendens, but there was no evidence that showed that the complaint itself was in the file. Just one moment, your honor. I apologize. I just want to take a look real quick. I think it's. Your honor, if I may, let me return to that if I don't run out of time. I think there is absolutely clear evidence that they had the copy of the Pacer docket search. I'm less certain as to whether the complaint itself existed in the file. But the Pacer docket search is not of the complaint. It's just lists that there is a filing. It's exactly what you see when you get that first page, your honor, with counsel and the nature of the claim, et cetera. The first page of an ECF printout. Um, there's been discussion of the accountant as an expert and Mr. Rosenfeld referred to what the accountant told WBL when they asked him. And what Mr. Rosenfeld said was the accountant described her as a, a legitimate princess and be their actual, the actual transfers occurred. Neither of those are the question. Their concern was, are these actually gifts? Abu Jabi had told them that these multimillion dollar sums from somebody, not a family member from outside the U S were gifts on its face. That representation cries out for an investigation that can get to the answer to the question. Are they gifts? They didn't even ask him that question. They said, did you prepare and file the 35 twenties? And he said, yes. And if they had asked him if that means that he had known it to be false, he could not have filed them. Right? No, sir. But yes, sir, that's correct. But he did not know them to be true. All he's representing is that my, my client, my taxpayer has represented this to me. It collapses back to Mr. the very statement they should be investigating. Compare that to what would they need to hire an FBI? I'd say maybe that's the line. That's the expert that you think they needed was like a retired FBI agent to like unravel the fraud. Not at all. You don't need it. What is it that you think they should have done? I mean, I guess I'm just, I'm still struggling a little bit. You know, the guy says it's a gift. I go to the accountant, there's a gift tax return. Like put him on a polygraph, like hire an FBI agent. Like what is it that you think they should have done in the, in the gift tax context? Either of two things, Your Honor. Recall that one of the representations that the accountant told them was the apartment was purchased as a residence for the daughter of the woman who supplied the money for the purchase. At that point, WBL has two clear options. They can, A, ask the daughter if this gift story is true, or B, ask to be put in touch with Ms. Al-Sabah and ask her. It doesn't require an FBI agent. It doesn't require a polygraph. It requires going to the source of the alleged gift and saying, is this true? Had they done that, had they not stuck their head in the sand on that one crucial thing, none of this would have resulted in anywhere near the damage. It seems like the linchpin for your argument, but on all three of the lines is, you can't trust the professional title insurance company, you can't trust the professional lawyer, you can't trust the professional accountant, and that just seems like a bizarre position to take. I don't think it's, I respect Your Honor's view, I don't think it's bizarre to take it when you have knowledge, actual knowledge that those representations are not true. You're, you can't simply. The actual knowledge that the gift tax representation, that the gift representation was not true. Like, what is the, what is the possible actual knowledge? I don't, what is the actual knowledge that they had that this was not a gift? They knew that it had been purchased as a home for her. That is fundamentally, for the daughter, that is fundamentally inconsistent with the idea that it's been gifted to him. They knew that. And from that, they, they had at your, your argument. All right. That's helpful. To the extent your argument turns on that, that's like helpful framing. That's, I appreciate that. I, I, I, I see I'm past my time. If I could, Mr. Judge Richardson, I would say, yes, that's helpful, but that's, that's nowhere near the significance of them simply sticking their head in the sand in the face of this information that all they had to do was ask the person who could give them a definitive answer. No FBI, no polygraph, no additional experts. Pick up the phone or send an email, email and ask the purported, uh, giver of the gift. Was it a gift? Thank you so much for your patience, Mr. Williams. Thank you, sir. We're gonna, we're gonna come down and greet you and send our, uh, uh, remote greetings to Mr. Rosenfeld. Um,
judges: G. Steven Agee, Stephanie D. Thacker, Julius N. Richardson